UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
LINDA M. YOUNGMAN,

                                             DECISION

                  Plaintiff,              and ORDER

vs.                                     12-CV-6500T

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

_____

## INTRODUCTION

Plaintiff, Linda M. Youngman ("Youngman" or "Plaintiff"), brings this action pursuant to the Social Security Act § 216(i) and § 223, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence in the record and is contrary to applicable legal standards. On July 24, 2013, the Commissioner moved for judgment on the pleadings pursuant to 42 U.S.C. § 405 (g) on the grounds that the findings of the Commissioner are supported by substantial evidence. On July 27, 2013, Plaintiff cross-moved for summary judgment seeking to reverse the Commissioner's decision.

For the reasons set forth below, this Court finds that there is substantial evidence to support the Commissioner's decision. Therefore, the Commissioner's motion for judgment on the pleadings is granted and the Plaintiff's motion is denied.

## PROCEDURAL HISTORY

On February 25, 2009, Plaintiff filed an application for DIB and SSI under Title II, § 216(i) and § 223 of the Social Security Act, alleging a disability since March 20, 2007 arising from abdominal problems, shoulder and back pain and headaches.   T. 159-193. Plaintiff's claim was denied on May 14, 2009.   T. 83-88. At Plaintiff's request, an administrative hearing was conducted on July 14, 2010 before an Administrative Law Judge ("ALJ") at which Youngman testified and was represented by counsel. A vocational expert also testified. T. 46-81.

On August 27, 2010, the ALJ issued a Decision finding that Youngman was not disabled. T. 19-35. On June 9, 2011, Plaintiff filed a subsequent application for SSI which was granted by decision after a hearing on November 29, 2012 granting benefits as of the application date of June 9, 2011. On July 25, 2012, the Appeals Council denied Plaintiff's request for review of her first application, making the ALJ's Decision the final decision of the Commissioner. T. 1-3.  This action followed seeking review of the denial of the first application and awarding Plaintiff DIB from March 20, 2007 until June 9, 2011.

## BACKGROUND

Plaintiff is a 48 year old high school graduate. T. 180, 192. She worked most recently as a stocker at a dollar store until 2005. T. 185. Youngman worked in assembly at a box factory, a cashier at a grocery store and as a custodian in a school after working for seven years from 1993 through 2000 owning and operating a bar/restaurant. T. 185, 205. As owner/manager of the bar/restaurant, Plaintiff cooked, cleaned, waitressed, tended bar, did books and payroll. T. 206.

At the time of the hearing, Youngman spent a typical day taking her medications, washing dishes and running the dishwasher, doing laundry, watching television and going to medical appointments. T. 195, 197. Youngman was able to cook dinner for her son at times and shopped for groceries twice a week. T. 195, 198.

A. <u>Medical History</u>

Plaintiff began treatment for a "sharp stabbing" pain in her stomach in March, 2007. T. 202. She also had pain in her back and experienced frequent headaches. T. 202. At the time of her application for disability, Youngman was taking Flexoril, Vicodin, Gabapentin, and Tylenol for pain. T. 203.

In 2004 Plaintiff was treated for pain along her rib cage and shoulders. T. 272. Youngman presented to the emergency room in February, 2005 for knee pain. She was given Motrin, Flexeril and

Viocodin. T. 271, 273. Upon follow up with her primary care physician, Dr. Arif Choudhury of Wayne Medical Group, no numbness or tingling was noted. She was diagnosed with lumbar strain and continued on medications. T. 273.

In March, 2007, Youngman underwent exploratory laparotomy for abdominal pain and vomiting. T. 453. She had presented to the emergency room with complaints of nausea, vomiting and abdominal pain. T. 917. A CT scan showed a very large stomach and a duodenum with a possible herniation. T. 917. The laparotomy showed no herniation but there was a mass in the head of the pancreas as well as a mass in the body of the pancreas. T. 917. Her family indicated that Plaintiff was a heavy drinker and had difficulty with nausea, vomiting and abdominal pain for many months to years prior to this episode. T. 917.  The appendix was removed and gastrojejunostomy performed. T. 453.

In September, 2007, Plaintiff had some pain in the upper abdomen with occasional nausea. T. 453. Plaintiff had an endoscopy performed in November, 2007 which found possible gastritis, and possible marginal ulcer. T. 446. She was prescribed Nexium. An MMRI of the abdomen conducted in December, 2007 showed a normal scan with some fat containing umbilical hernia. T. 469.

An endoscopy conducted on January 21, 2008 showed no evidence of a marginal ulcer but she was diagnosed with gastritis and prescribed Nexium. T. 477. Medical notes from Dr. Dana Miller of January 21,

2008, note that Plaintiff's pain was related to gastritis and marginal ulcerations. Dr. Miller advised Plaintiff to stop smoking and drinking. T. 486. Although Plaintiff claimed she only drank one to two times a week, Dr. Miller noted that Plaintiff smelled of alcohol. T. 486. Plaintiff was treated in March, 2008 for pelvic pain of unknown origin. T. 267. Youngman was referred to the pain clinic and advised to watch her food habits. T. 267-68.

Images done in May, 2008, showed no obstruction in the digestive tract. T. 557. Dr. Stephen Ettinghausen, a surgeon from Rochester General Hospital, first examined Plaintiff on July 18, 2008 for abdominal pain and vomiting. T. 376. CT scans in August, 2008 also showed no evidence of obstruction nor inflammatory changes. Plaintiff had a follow up examination in September, 2008 for epigastric pain. T. 265. She was diagnosed with diffuse gastritis, was advised to limit acid producing foods and prescribed neurontin. T. 265. In October, 2008, Plaintiff was seen by Dr. Effinghausen and had bowel resection surgery on October 21, 2008 to prevent bile reflux. T. 266. The surgery went as planned with a normal post-operative course. T. 360. She was diagnosed with "alkaline gastritis" and "possible duodenal obstruction." T. 362. In November, 2008, Plaintiff was treated for restless leg syndrome and assistance with cessation of smoking. T. 264. Youngman reported to have a sharp pain in the right upper back of the thoracic area since she had surgery. T. 264. She was taking Percocet prescribed by Dr. Ettinghausen which was helping with easing the pain. T. 264. In the medical notes of November 6,

2008, Plaintiff reported to Dr. Ettinghausen that she felt the best she has in a long time and spoke of returning to work. T. 373. She weighed 149 pounds and was taking Protonix and Percocet for post-operative pain. T. 373. In a post-surgical follow-up appointment, Dr. Ettinghausen noted that Plaintiff was doing "very well" and no longer had the abdominal pain that she had preoperatively. T. 370. However, he noted that Plaintiff still had a focal area of tenderness in her abdominal wall that could still be detected. He directed an abdominal CT scan over the area of tenderness. T. 370.

In January, 2009, Dr. Choudhury's medical notes indicate that Plaintiff complained of headaches and that she did not sleep due to gastritis pain. T. 257. Dr. Choudhury increased the Ambien prescription to assist with sleeping. T. 257. Also in January, 2009, Plaintiff was treated at Wayne Medical Group for restless leg syndrome and her left ankle pain. An x-ray was taken of the ankle which showed no breakage nor any other degenerative changes or evidence of acute trauma or destructive lesions. T. 263, 316. On January 12, 2009, Plaintiff was treated with physical rehabilitation for mid-thoracic pain and low cervical area pain. T. 693. Youngman was treated with manual therapy to decrease sensitivity followed with a graded approach to exercise, education in an attempt to resolve pain and promote good posture. T. 693. Plaintiff contined with therapy through May, 2009 with some success. T. 693-713, 751-777. Her therapist noted that Plaintiff gained "good functional" range of motion of "bilateral UE, C-T-L spine without pain." T. 777.

In February, 2009, Plaintiff called Dr. Choudhury's office complaining of severe headaches. She was taking Nicopraflex for back pain with the residual benefit of better headache control. But when she returned to Vicodin, it was not as effective in controlling the headache pain. T. 260. Dr. Choudhury advised Plaintiff to lose weight and quit smoking. He also referred her to a pain clinic. T. 260. On March 30, 2009, Dr. Choudhury treated Plaintiff for ongoing pain of her right side and for pain in her back. T. 255. He prescribed nicotine patches to help her quit smoking and continued her medication regiment. T. 255.

Dr. Ajai Nemani of Interventional Pain Management treated Youngman from February through May 2009 for left sided abdominal pain and right sided shoulder blade pain since her surgery in October, 2008. T. 330-40. A CT scan of Youngman's abdomen was negative. The pain emanated from an area where a tube was placed after her bypass surgery in March, 2007. T. 338. Plaintiff was taking Vicodin, Ambien, Ropinirole, Gabapentin, Rantidine and Prevacid at this time. The medical records indicate that Plaintiff was not working, smoked and took recreational drugs. T. 339. Dr. Namani observed that Plaintiff's range of motion of the knees was normal but flexion and extension of the back was painful. T. 339. Dr. Nemani treated the abdominal pain with a trigger point injection at the site of the drain incision. T. 340. A week later, Youngman returned to Dr. Nemani for treatment of ankle pain. T. 336. She was able to transfer and walk about the room and appeared in "no acute distress." T. 337. Dr. Nemani opined

that the ankle symptoms were resolving and no further treatment was necessary but he would proceed with injections for abdominal pain. T. 337. After two nerve blocks, Youngman reported that the first did not work but the second helped relieve pain temporarily in that region. T. 330. Dr. Nemani ordered x-rays for thoracic and lumbar spine and recommended physical therapy for the pain. T.331 The x-rays were "normal studies" except showing "mild osteophyte formation at L3-L4." T. 334. Dr. Nemani recommended physical therapy to treat Youngman's pain. T. 335.

Plaintiff was treated by a gastroenterologist, Dr. Craig Weise, on April 10, 2009 for her continued abdominal pain. T. 341-344. Dr. Weise noted Youngman's history of gastric bypass surgery, as well as appendectomy and cholecystectomy. T. 341. Dr. Weise noted that Plaintiff walked with a normal gait and range of motion and had no significant abnormalities with her abdomen. T. 343.  He counseled Plaintiff on the possibility of her pain being neuropathic. T. 343. He continued Plaintiff on Prevacid and recommended discussing neuropathic pain with the pain specialist as well as conducting an Esophagogastroduodenoscopy ("EGD") to examine the lining of the esophagus and first part of small intestine. T. 344. The EGD found two small polyps and internal hemorrhoids but otherwise the endoscopy was "normal". T. 347, 352, 1063.

Dr. Sandra Boehlert conducted an independent medical examination of Plaintiff on April 29, 2009. T. 354-358.  She noted that Plaintiff

complained of pain in the right side of her stomach, right shoulder and right back which began after an appendectomy and gastric bypass surgery in 2007. T. 354. Plaintiff did not lose weight after the surgeries and had a subsequent surgery to drain her bowel in 2008 that did not bring her relief from pain. T. 354. Youngman told Dr. Boehlert that she walked a quarter of a mile daily. T. 354. Youngman claimed that she had intermittent dizziness and chronic headaches. T. 354. Dr. Boehlert inquired whether Youngman's primary doctor knew that she was on Cyclobenzaprine, Gabapentin and Amitriptylilne at the same time which could cause dizziness as a side effect. In addition to these medications, Plaintiff was also taking Ropinirole, Ranitidine, Prevacid, Lovaza, Ambien, Hydrocodone, Acetaminophen and Nicotine patch. T. 355. Plaintiff also noted that she was forgetful and had memory loss. T. 355. Youngman told Dr. Boehlert that she smoked half a pack of cigarettes each day but took no street drugs and drank little alcohol. T. 355. She could cook, clean, do laundry, and shop as long as she has a cart to hold onto. T. 355. She cooked six or seven days of the week, cleaned six times a week and was able to shower and dress herself. T. 355. Plaintiff visited her aunt or grandmother's house down the road and socialized with friends. She weighed 209 pounds at five feet tall. T. 356. Dr. Boehlert diagnosed Plaintiff with chronic severe abdominal pain, chronic headaches, dizziness and unsteadiness possibly caused by medications, right shoulder pain and low back pain. T. 357. Dr. Boehlert found Plaintiff to have "moderate to

marked limitation to repetitive twisting, bending, and heavy lifting due to abdominal pain and market abdominal surgeries." T. 358.

A Physical Residual Functional Capacity Assessment was prepared on May 12, 2009 by S. Putcha. T. 715-720. Plaintiff was found to be able to occasionally lift or carry 10 pounds, could frequently lift or carry less than 10 pounds, could stand or walk at least two hours of an 8 hour day, could sit about 6 hours in an 8 hour day, and had unlimited ability to push or pull. T. 716. Plaintiff was described as a 43 year old woman who had abdominal surgery for gastric bypass and Roux-en Y procedure which relieved alkaline gastritis and nausea. T. 716. Plaintiff still had abdominal pain and dizziness. She has no musculoskeletal issues. T. 716. No other limitations were noted in the report. T. 716-718.

Plaintiff was treated in the emergency room on May 13, 2009 for a swollen ankle. T. 1074-1078.  After fracture and sprain were ruled out, she was diagnosed with edema, prescribed Naproyn and advised to keep her ankle elevated and iced. T. 1078.

On August 38, 2009, Dr. Ettinghausen examined Plaintiff with regard to abdominal pain. He noted that an endoscopy in June showed a small bowel ulcer but an April 2009 endoscopy was negative. T. 375. Her CT scan of July, 2009 showed several midline incisional hernias containing fat. Dr. Ettinghausen successfully repaired the hernias on September 23, 2009. T. 375, 784.

Plaintiff presented to the emergency room in June, 2009 for chest pain. T. 873. She was discharged and directed to follow up with her own physician. T. 867.

Plaintiff was treated for headaches by Dr. Gene Tolomeo of Ontario Neurology Associated beginning in April, 2009 through September, 2009. T. 860-862. Dr. Tolomeo's neurological examination was "normal" and opined that Plaintiff suffered from tension headaches. T. 862. He also considered that Plaintiff was having rebound headaches from extensive use of Tylenol. He ordered an MRI to rule out intracranial mass pseudotumor and started her on Amitriptline. T. 862. In June, 2009, Dr. Tolomeo examined Plaintiff and noted that she still takes excessive amounts of Tylenol. He again concluded that her headaches are tension related compounded with rebound pain from excessive Tylenol use. T. 861. Plaintiff also suffered from insomnia and depression for which Dr. Tolomeo suggested she obtain a stronger antidepressant.  He increased Neurontin dosage to help her sleep. T. 861. In September, 2009, Dr. Tolomeo's medical notes indicate that Plaintiff was improved. She was taking Topamax which decreased the headaches to the point where she rarely gets headaches and the medicine. T. 860.

Plaintiff also presented to the emergency room in 2009 for bronchitis and left ankle pain. T. 904, 912. Both of these visits resulted in finding no acute injury.

Dr. Ajai Nemani of Pain Interventions treated Plaintiff from June, 2009 through February, 2010 for mid-back and ankle pain. T. 1101. He treated her with facet joint injections for back pain. T. 1100.

Plaintiff began treatment at Westfall Cardiology in June, 2009, for edema and shortness of breath. T. 1109. Nurse Practitioner Ellen Bartle advised Plaintiff to get serious about quitting smoking and adhere to a sodium restricted diet. T. 1111. A stress test and ECG test results showed a normal pattern of perfusion in all regions. The post stress left ventricular function was normal. T. 1117.

In August, 2009, Plaintiff was treated for urinary retention. T. 1462. A cystoscopy was performed which showed  hematuria and squamous metaplasia. T. 1464.  After treatment for a yeast infection, Dr. Choudhury discussed the likelihood of incomplete emptying secondary to medications and the need to quit smoking. T. 1468.

On March 3, 2010, Plaintiff was treated by Dr. Gregory Finkbeiner of Greater Rochester Orthopaedics for left ankle pain and swelling as well as right knee discomfort. T. 1128. Dr. Finkbeiner diagnosed Plaintiff with posterior tibial tendonitis and referred Plaintiff to physical therapy. T. 1129. The knee was opined to have mild medial joint line tenderness. T. 1129. In April, 2010, Plaintiff was again examined by Dr. Finkbeiner who noted that physical therapy has been of limited benefit. T. 1136. He ordered an MRI scan which showed no effusion or fracture but that Plaintiff had a posteromedial

osteochondral lesion of the talus to be treated with a cortisone injection. T. 1133.

Physical therapy notes from March, 2010 indicate that Plaintiff had gait deviations, edema and limited range of motion and strength at the left ankle. T. 1326. She was treated with stretching, strengthening, and gait training and her prognosis was good. T. 1326.

Plaintiff began expressing concerns of depression and lower energy levels beginning in February, 2009. T. 1167. She was prescribed Effexor and by March, 2010, was showing signs of improvement. T. 1172.

Dr. Tolomeo examined Plaintiff in February, 2010 for a neurologic consultation for left foot pain. T. 1421. He found that Youngman did not have electrodiagnostic evidence of tarsal tunnel syndrome or a sensory neuropathy. He suggested that Plaintiff would benefit from weight loss, muscle relaxants and physical therapy. T. 1421.

An upper GI series conducted in May, 2010 had normal findings. T. 1245. Plaintiff had a normal course and caliber esophagus and stomach. T. 1245. In June, Plaintiff was evaluated at a sleep disorder center for multiple sleep issues such as suspected apnea, awakenings, restless leg syndrome, loud snoring and sleep walking. T. 1334. The nocturnal polysomnogram performed in July, 2010 showed "at least mild obstructive sleep apnea" but the severity could have

been underestimated due to a reduced amount of REM sleep seen. T. 1541.

On July 6, 2010, Dr. Choudhury and his colleague Dr. Michael Wittek, completed a Physical Residual Functional Capacity form for Plaintiff. T. 1338-1339. Dr. Choudhury opined that Plaintiff could sit at one time for a total of one hour in an 8 hour workday. She could stand only 30 minutes at one time and up to two hours total during an 8 hour workday. Plaintiff could occasionally lift or carry up to 25 pounds but never more than 25 pounds. T. 1338. Plaintiff was not limited in grasping, pushing, pulling, or fine manipulations. T. 1338. Plaintiff could occasionally bend, squat, crawl, climb, and reach. She had moderate limitation with unprotected heights, mild limitation to being around moving machinery but no limitations for driving automotive equipment, exposure to dust, fumes nor exposure to changes in temperature or humidity. T. 1338. Dr. Choudhury noted that Plaintiff's medications could interfere with work tasks requiring sustained concentration and she would need to miss work three days a month for pain symptoms. T. 1339. He opined that Plaintiff could work three to four hours a day before pain prevented her from performance of even simple tasks. T. 1339.

Plaintiff was treated at Wayne Behavioral Health Network in June, 2010 for depression. Their treatment notes indicate that Plaintiff used marijuana three to eight times a week and drank alcohol daily. T. 1344.

In July, 2010, Plaintiff was again treated with injections for pain in the abdomen and ankle. T. 1362. At a follow up appointment in September, Plaintiff reported that the injections did not work to alleviate the pain. T. 1365.   Plaintiff was now having difficulty aspirating. T. 1365.  Dr. Nemani refused to prescribe opiates because of Plaintiff's recreational drug use. T. 1366, 1375.

Youngman went to the emergency room in September, 2010 with numbness in the right arm.  She was examined for possible stroke and an MRI performed. The MRI revealed degenerative change with mild to moderate foraminal stenosis and moderate to marked spinal canal stenosis. T. 1390. A stroke was ruled out. T. 1390.  Youngman was operated on in October, 2010 for a deviated nasal septum and removal of a benign left vocal cord lesion. T. 1386-88, 1406.

Medical notes from Westfall Cardiology in November, 2010 indicate that Plaintiff had a moderate degree of COPD from longstanding history of smoking and sleep apnea. T. 1406. She also had degenerative joint disease in her back and knee and dropped bladder, restless leg syndrome and depression.  She was not hypertensive and suggested no longer taking Lasix and potassium and to have her other doctors simplify her medications.  T. 1406.  At the time, Plaintiff was taking Abilify, Venlafaxine, Lovaza, sucralfate, Kapidex, Tramadol, Ropinirole, Ambien, cyclobenzaprine, Topiranate, Gabapentin, Effexor, Lisinopril-Hydrochlorothiazide, Potassium Choride and Furosemide. T. 1406.

Plaintiff was in physical therapy in 2010 for numbness and decreased sensation in the right hand and thumb. There was also treatment for weakness in the right upper extremity and complaints of right cervical and scapular pain and tenderness.  In addition, she had complaints of lumbosacral pain, left knee, foot pain and ankle pain.  CT scan was negative and Plaintiff admitted smoking marijuana on a daily basis along with two to two and a half packs of cigarettes. T. 1501.  Her condition improved over the course of treatment. T. 1442-1442.

An MRI of the cervical spine showed mild disc height loss at C5-6 and C6-7 levels but no stenosis except mild to moderate stenosis at C5-C6. There was no abnormal signal within the spinal cord to explain the arm tingling and numbness. T. 1531.

Medical records from September, 2010 indicated that Plaintiff's depression was "well controlled" with Effexor. T. 1534.

Plaintiff was experiencing left knee pain beginning in 2010. T. 1536. She was diagnosed with a right knee meniscal tear which was treated with arthroscopy with partial medial meniscectomy on January 12, 2012. T. 1517.

B. Plaintiff's Hearing Testimony

Plaintiff testified that she last worked at Dollar General Store in 2005 when she was let go because of lack of work. T. 52. Prior to

that, Youngman worked in a school as a janitor and for a box company stacking pallets. T. 52.

Although Plaintiff had the ability to drive, she did not drive because she had a suspended license for failure to pay traffic tickets. T. 53. She lived with her mother, fiancee, son and another relative. T. 53. Youngman was able to help with chores such as light vaccuuming and washing dishes. T. 54.

Youngman testified that she was unable to work because she needed to lie down and rest many times during the day and she was physically unable to do things. T. 55. She has restless leg syndrome that she claimed happened every day whereby she would need to lie down. T. 55-56. Youngman used medication to control her pain and symptoms.  For restless leg syndrome, she was taking Ropinirole. T. 56. She was taking Ambien to sleep, Gabapentin, calcium carbonate, potassium, Cyclobenaprine, Sucralfate and another medication for stomach pain and Tramadol. T. 57.

Plaintiff testified that she felt nauseous and vomited bile three to four times a week for fifteen minutes up to two hours at a time. T. 58. She also had abdominal pain that could be mild or so painful she needed to lie down. T. 58. The gastritis also had affected her nasal passages and vocal cords. T. 59.

Youngman had pain in her left foot which also swelled. T. 61. Injection treatments help the pain. T. 61. She also experienced frequent headaches that she was treating with Topamax. T. 62.

Plaintiff testified that her counselor believed that the headaches are related to her depression and they affect her ability to concentrate. T. 62. She was treating the headaches with Ibuprofen. T. 64.

Plaintiff began treatment for depression in July 2010. She felt fatigued, uninterested in doing things and has frequent crying episodes. T. 65.

Youngman testifed that she could stand for up to a half hour at a time. T. 66. She could walk five houses down the road to her grandmother's house every day but then needed to rest. T. 66. She could sit up to two hours at a time and spent most of her time lying down. T. 67. Bending over may cause Plaintiff to feel dizzy and she had difficulty keeping her balance. T. 69. Plaintiff enjoys fishing as a hobby. T. 70.

C. <u>Vocational Expert Testimony</u>

A vocational expert testified that with a hypothetical individual with the same age, education and work experience of Plaintiff who could perform light work with a sit/stand option alternatively at will who would never leave the work station, never climb a ladder, only occasionally climb ramps or stairs and occasionally stoop, kneel, crawl or crouch, could understand simple instructions, make judgments on simple work related decisions, interact appropriately with supervisors and co-workers in routine work settings, and respond to usual work situations, changes and

routine work settings and also avoid concentrated use of heavy, moving machinery, could not do Plaintiff's past relevant work. T. 73-74. However, such a hypothetical individual could perform work as a switchboard operator, a plastic molding machine tender or ticket seller. T. 74-75.

By changing the type of work the hypothetical individual could perform to sedentary, the Vocational Expert testified that the individual could no longer perform the work of a plastic molding machine tender but could perform the work of a telephone survey worker. T. 76. If this individual were to require being off work for 15 percent of the time, he could not sustain employment. T. 76. If the hypothetical individual would need to take unscheduled work breaks of thirty minutes each day, it would not affect their ability to work. T. 77. However, if they were also limited to standing a total of two hours a day, the expert testified that sedentary jobs would be viable. T. 78.  If an individual could only sit for four hours a day, the expert testified that it would require an accommodation by the employer but full time employment was still possible. T. 79.

## DISCUSSION

### I. Scope of Review

Title 42 U.S.C. §405(g) directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  The Court's scope of review is limited to determining whether the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).

Judgment on the pleadings pursuant to Rule 12(c) may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988).  If, after reviewing the record, the Court is convinced that the plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. see generally Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

## II.  The Commissioner's Determination is Supported by Substantial Evidence in the Record

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  In doing so, the ALJ adhered to the Social Security Administration's five step sequential analysis evaluating disability benefits. (Tr. 12-18)  The five step analysis requires the ALJ to consider the following: 1) whether the claimant is performing substantial gainful activity; 2) if not, whether the

claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities; 3) whether the claimant suffers a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment(s) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled; 4) if not, the ALJ next considers whether the impairment prevents the claimant from doing past relevant work given his or her residual functional capacity; 5) if the claimant's impairments prevent his or her from doing past relevant work, whether other work exists in significant numbers in the national economy that accommodates the claimants residual functional capacity and vocational factors, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

Under step one of the process, the ALJ found that the Plaintiff had not engaged in substantial gainful activity at any time during the period from her alleged onset date of March 20, 2007. T. 24. The ALJ next found that the Plaintiff suffered from the following severe impairments: neuropathic abdominal pain and gastritis, degenerative disc disease, degenerative joint disease of the left ankle, headaches, chronic obstructive pulmonary disease, sleep apnea, restless leg syndrome, obesity, hypertension, high cholesterol and depressive disorder. T. 24. At step 3, the ALJ found that Plaintiff's impairments did not meet or medically equal the listed

impairments in Appendix 1, Subpart P. T. 18.  Further, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of sedentary work except that Plaintiff would require the option to sit or stand alternatively at will which would be performed at the work station and would not require the claimant to be off task, that she could never climb ladders, ropes or scaffolds, only occasionally climb ramps or stairs, only occasionally stoop, kneel, crouch and crawl and should avoid concentrated use of heavy moving machinery. He also found that Plaintiff would be able to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers in a routine work setting and respond to usual work situations and changes in a routine work setting. T. 26.  The ALJ next determined that Plaintiff was not able to perform her past relevant work. T. 33. Finally, the ALJ determined that considering Plaintiff's age, education, past relevant work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform. T. 34-35.

Plaintiff argues that the ALJ erred by: 1)failing to properly evaluate the medical evidence in establishing the Plaintiff's residual functional capacity; 2) failing to properly evaluate Plaintiff's credibility; and 3) relied on invalid vocational expert testimony.  I find that there is substantial evidence in the record

to support the ALJ conclusion that the Plaintiff was not disabled within the meaning of the Social Security Act.

A. <u>Substantial Evidence in the Record Supports the ALJ's Evaluation of the Medical Evidence</u>

Plaintiff first contends that the ALJ failed to properly apply the treating physician rule. Specifically, she argues that the ALJ failed to accord controlling weight to Plaintiff's treating physician, Dr. Choudhury, in his functional capacity assessment.

Pursuant to the treating physician rule, the medical opinion of the physician engaged in the primary treatment of a claimant is given "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ may decline to give controlling weight to a treating physician's opinion based on, <u>inter</u> <u>alia</u>, "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark v. Commissioner of Social Security</u>, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). The Second Circuit requires that the ALJ's consideration of the treating source evidence be explicit in the record. <u>Burgin v. Astrue</u>, 2009 WL 3227599 (2d Cir. October 8, 2009). Here, the ALJ properly considered the weight to be given the

conflicting medical opinions and articulated good reasons for not giving Dr. Choudhury's opinion controlling weight.

The ALJ gave little weight to Dr. Choudhury's opinion as to Plaintiff's capacity. T. 32. Dr. Choudhury opined that Plaintiff could sit for one hour at a time or four hours total in an eight hour workday, could stand and walk one half hour at a time or two hours total in an eight hour workday, that pain and medications would interfere with tasks requiring sustained concentration and that exacerbations of pain would make it impossible to function in a work setting requiring her to miss work three days per month. T. 1339. The ALJ concluded that the objective findings in the medical evidence do not support limitations to such a degree.

The ALJ thoroughly evaluated the objective medical evidence.  He took note that Plaintiff's frequent visits to the emergency room for gastric pain consistently ended in discharge without hospital admission and conservative treatment of medications. T. 28. Plaintiff's treatment by specialists such as a gastrointestinal specialist only found two benign polyps. The ALJ considered that Plaintiff underwent surgery for loop gastrojejunostomy to a Roux-en-Y gastrojejunostomy to resolve bile reflux gastritis but noted that this is a common condition following gastric surgery and that the medical notes indicate it resolved the vomiting issue Plaintiff was experiencing. T. 28.  Plaintiff was treated for pain with trigger point injections.  The ALJ also specifically noted that endoscopy

procedures in 2009 were negative and the abdominal pain considered "neuropathic." T. 29.

With regard to Plaintiff's back pain, the ALJ considered that Plaintiff was diagnosed with lumbar strain and treated conservatively with muscle relaxants, anti-inflammatory and pain medications in 2009. T. 29. X-rays showed mild osteophyte formation at L3-L4 but were otherwise normal. T. 29. The ALJ also gave a detailed analysis of the objective medical findings regarding Plaintiff's left ankle pain. X-rays showed minimal degenerative change and a small plantar osteophyte but no acute abnormalities. T. 29. Plaintiff had a full range of motion of the ankle and foot with only some tenderness. She was able to fully bear weight and to ambulate with mild difficulty. T. 29.  The ankle was treated with anti-inflammatory medication, ice and elevation. T. 29. In 2010, the ALJ pointed out that a podiatrist diagnosed possible tendonitis in the ankle, suggested the use of an ankle brace, and referred Plaintiff to physical therapy. T. 30. An MRI in 2010 showed posttraumatic changes of the medial malleolus, intact tendons and ligaments, and mild degenerative changes. T. 30. She was treated with cortisone injections.

The ALJ also addressed the objective evidence concerning Plaintiff's headaches. A neurological examination was normal and an MRI ruled out any intracranial mass. T. 30. The ALJ also pointed out that the neurologist diagnosed Plaintiff with tension headaches with

a rebound component from overuse of Tylenol. T. 30. By the end of 2009, Plaintiff was doing better with a new medication.

The ALJ considered Plaintiff's treatment for cardiac disease noting that the cardiac testing showed no abnormalities. Finally, the ALJ considered Plaintiff's depression. He noted there was little evidence other than an initial diagnosis of a depressive disorder. T. 31. He acknowledged that Plaintiff claimed to be unmotivated and withdrawing from family and friends yet this was inconsistent with her social drinking and recreational drug use, daily visits with family and examination records that show her concentration and memory were intact. T. 31.

The ALJ gave some weight to the opinion of Dr. Putcha, the State agency physician. T. 33. Dr. Putcha found that Plaintiff could occasionally lift and/or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for a total of two hours in a workday, sit for six hours in a workday and perform unlimited pushing and pulling. T. 716.  The ALJ concluded that these limitations support a finding that Plaintiff could perform a range of sedentary work and were consistent with the objective medical evidence.

Similarly, the consultative examination by Dr. Boehlert supports this finding. Dr. Boehlert found that Plaintiff had moderate to marked limitation in repetitive twisting, bending and heavy lifting. R. 358. She based her finding on her examination of Plaintiff which showed Plaintiff walked with a normal gait, used no assistive

devices, needed not assistance changing for the examination, had full flexion and extension of the cervical and lumbar spines, had full range of motion in the shoulders, elbows, forearms, wrists, hips, knees, and ankles. T. 357.

The ALJ specifically found that the medical evidence as a whole documents physical impairments which would reduce Plaintiff's stamina but that it does not document limitations to the degree opined by Dr. Choudhury. Therefore, the ALJ properly accorded little weight to Dr. Choudhury's finding of Plaintiff's limitations because it was not consistent with the medical evidence. T. 32.

Conversely, Dr. Boehlert and Dr. Putcha's reports are consistent with the objective medical record as well as Plaintiff's activities of daily living. T. 21. Plaintiff indicated that she shopped, cooked, dressed and bathed himself, and socialized with friends. T. 267.  She was also able to climb stairs.

I find substantial evidence for the ALJ to find that the opinion of Dr. Choudhury regarding Plaintiff's residual functional capacity was not consistent with the record as a whole. Therefore, this Court finds that the ALJ did not violate the treating physician rule in giving greater weight to the findings of Dr. Boehlert and Dr. Putcha.

B.   The ALJ's Credibility Assessment is Supported by Substantial Evidence

In determining Plaintiff's residual functional capacity, the ALJ considered Plaintiff's statements about her subjective complaints of

pain and functional limitations and found that they were not entirely credible. The ALJ determined that Plaintiff's testimony of symptoms at "such a level of severity is not supported by treatment evidence and is therefore not fully credible." T. 32. Plaintiff argues that the ALJ's credibility determination is unsupported by substantial evidence.

"The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms." Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013). Thus, it is not logical to decide a claimant's RFC prior to assessing her credibility. Id. This Court, as well as others in this Circuit, have found it improper for an ALJ to find a plaintiff's statements not fully credible simply "because those statements are inconsistent with the ALJ's own RFC finding." Ubiles v. Astrue, No. 11-CV-6340T (MAT), 2012 WL 2572772, at *12 (W.D.N.Y. July 2, 2012) (citing Nelson v. Astrue, No. 5:09-CV-00909, 2012 WL 2010 3522304, at *6 (N.D.N.Y. Aug. 12, 2010), report and recommendation adopted, 2010 WL 3522302 (N.D.N.Y. Sept. 1, 2010); other citations omitted)). Instead, SSR 96-7p requires that "[i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record." SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996); 20 C.F.R. §§ 404.1529, 416.929.

However here, the ALJ measured Plaintiff's credibility by evaluating all of the required factors bearing on Plaintiff's

credibility prior to deciding Plaintiff's RFC. He discussed Plaintiff's daily activities, frequency and intensity of Plaintiff's symptoms, Plaintiff's compliance with physician directions and the treatment of Plaintiff's symptoms. The ALJ determines issues of credibility and great deference is given his judgment. Gernavage v. Shalala, 882 F.Supp. 1413, 1419, n.6 (S.D.N.Y. 1995).

The ALJ first noted that the totality of the objective medical evidence did not corroborate Plaintiff's complaints of pain and functional limitations. Also, the ALJ considered Plaintiff's alcohol and marijuana use. Despite claims of disabling stomach pain, and repeated directions by physicians to refrain from alcohol use, Plaintiff continued to drink throughout the period at issue undermining her overall credibility. T. 32. The ALJ also took account that despite complaints of disabling limitations, Plaintiff did household chores and walked to social visits on a daily basis.

The ALJ did not discount Plaintiff's complaints entirely. Rather, in assessing Plaintiff's residual functional capacity, the ALJ determined that Plaintiff would require sedentary work with a sit/stand option alternatively at will and that she would never be able to climb ladders, ropes, or scaffolds, only could only occasionally climb, balance, stoop, kneel, crouch and crawl, and avoid heavy moving machinery. T. 26. Accordingly, Plaintiff's argument that the ALJ failed to properly assess her subjective complaints is rejected.

C.  There is Substantial Evidence in the Record to Support the ALJ
Finding that Plaintiff Could Perform Jobs which Exist in Significant
Numbers in the National Economy.

Lastly, Plaintiff argues that the ALJ erred when he relied on
the vocational expert in determining that there were jobs that
existed in significant numbers in the national economy that Plaintiff
could perform. T. 33-34.

At step five, the burden is on the Commissioner to prove that
"there is other gainful work in the national economy which the
claimant could perform." Balsamo v. Chater, 142 F.3d 75 (2d Cir.
1998). The ALJ properly may rely on an outside expert, but there must
be "substantial record evidence to support the assumption upon which
the vocational expert based his opinion." Dumas v. Schweiker, 712
F.2d 1545, 1554 (2d Cir. 1983).

Plaintiff objects that the hypothetical posed to the vocational
expert was incomplete because it was based on an erroneous RFC due to
the ALJ's errors with regard to assessing Plaintiff's credibility and
the proper weighing of medical evidence. A vocational expert's
opinion in response to an incomplete hypothetical question cannot
provide substantial evidence to support a denial of disability. See
DeLeon v. Secretary of Health and Human Servs., 734 F.2d. 930, 936
(2d Cir. 1984).

The vocational expert testified at Plaintiff's hearing that a
hypothetical individual with limitations that corresponded to the
ALJ's RFC assessment could perform the jobs of switchboard operator,
a plastic molding machine tender, ticket seller or telephone survey

worker. T. 74-76.   Because there is substantial evidence in the record to support the RFC assessment of the ALJ, the ALJ is entitled to rely on the vocational expert's testimony that Plaintiff could perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §404.1560(b)(2).

**CONCLUSION**

After careful review of the entire record, and for the reasons stated, this Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the Commissioner's decision denying the Plaintiff's first application for DIB covering the period from March 20, 2007 until June 9, 2011 is affirmed. For the reasons stated above, the Court grants Commissioner's motion for judgment on the pleadings (Dkt. No. 11). Plaintiff's motion for judgment on the pleadings is denied (Dkt. No. 12), and Plaintiff's complaint (Dkt. No. 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

Honorable Michael A. Telesca

United States District Judge

DATED:   October 18, 2013

   Rochester, New York